OPINION
Defendants-appellants, Village of Craig Beach and Ohio Public Works Commission, appeal a decision of the Mahoning county Common Pleas Court adopting the decision of a magistrate made after a trial on the merits.
In April 1992, the Village of Craig Beach (Village) successfully applied to the state for financial assistance for a project entitled "Hillcrest Glendale Storm Water System" (Project).[1] The assistance came in the form of a grant from the Ohio Small Government Capital Improvement Program (OSGCIP), administered by the Ohio Public Works Commission (OPWC). The total estimated cost of the Project was $292,200.00. Under its agreement with the state, the Village was to contribute 10 percent of the total project cost ($29,220.00) and the OPWC was to contribute the remaining 90 percent ($262,980.00) from OSGCIP funds.
The state designated the Project as a "Minority Business Enterprise `Set-aside.'" (Defendant-Village Exhibit 2). This meant that as a condition of the OPWC's approving funds for the Project, the Village had to make available for bidding purposes the prime contracting and procurement opportunity exclusively to State Certified Minority Business Enterprises (MBE).[2]
Specifically, the Project had to result in a "Set-aside" Prime Construction Contracting Opportunity for Certified MBEs in an amount not less than $247,600.00 and a "Set-aside" Prime Procurement Contracting Opportunity for Certified MBEs in an amount not less than $44,600.00.
The prime procurement contract was awarded to Thomas Fok 
Associates, Ltd. (Fok), a State Certified MBE. Fok is a firm of consulting engineers, surveyors, and planners. Fok handled the engineering and design of the Project. Pursuant to the state's approval of OSGCIP grant money for the Project, Fok was designated as the Project Manager. As Project Manager, Fok was responsible for soliciting bids for the Project and supervising the construction and completion of the Project.[3]
Early in 1993, the Village advertised that it was accepting bids for the construction phase of the Project. Defendant Freeman Cargo Carrier, Inc., (Freeman Cargo), a State Certified MBE, submitted the successful bid at $159,381.00)[4]
(Defendant-Village Exhibit 5, BD-3).
Once Freeman Cargo was awarded the contract, it was required to submit to the OPWC information concerning the subcontractors and/or suppliers that it would be utilizing for construction of the Project. (Defendant-Village Exhibit 1). Plaintiff-appellee Miller-Yount Paving; Inc., (Miller-Yount), was one of the five subcontractors and/or suppliers listed by Freeman Cargo. Freeman Cargo indicated that Miller-Yount was going to provide services at a cost of $33,803.00. (Defendant-Village Exhibit 1).
At trial, Herbert Cottrell, President of Miller-Yount, testified that Miller-Yount initially supplied pipe and other materials, which allowed Freeman Cargo to get started on the Project. (Tr. 55). Cottrell also testified that Miller-Yount acquired the bond for the Project from the Trumco Insurance Agency, Inc., (Trumco), (Tr. 62), agent for the State Automobile Mutual Insurance Company (State Auto). The bond designated Freeman Cargo as the obligor and the Village as the obligee. (Defendant-Village Exhibits 3 and 4). Additionally, John F. Fox, President of Trumco, testified that Miller-Yount was indemnitor for the contract bond issued. (Tr. 150).
At some point, Freeman Cargo was unable to get the work done and the Village began receiving complaints about water backing up in residents' basements. (Tr. 71, 125-126). Consequently, Miller-Yount took over construction of the Project. (Tr. 71). Ultimately, no other subcontractors, including the other ones initially listed by Freeman Cargo, contributed services or materials towards construction of the Project. (Tr. 69).
As work on the Project progressed, the Village continued to direct payments for labor and materials to Freeman Cargo. (See Defendant-OPWC Exhibit 4). Miller-Yount received payment for some of its services, presumably from Freeman Cargo. (See Plaintiff's Exhibit E). However, by November 1993, Miller-Yount had contributed $141,822.64 worth of services and materials and received payment of only $50,000.00. Finding itself unpaid to the tune of $91,822.64, Miller-Yount filed a public works lien pursuant to R.C. 1311.26. (Plaintiff's Exhibit A). An OPWC internal document reflects that as of November 1993, a total of $98,812.76 in contract funds had been disbursed to Freeman Cargo, leaving a total of $67,028.24 ($165,841.00 — $98,812.76) in contract funds remaining. (Defendant-OPWC's Exhibit 4).
The Village, Freeman Cargo, and Miller-Yount, together with their respective counsel, met in April or May of 1994 to discuss resolution of Miller-Yount's claim. (Tr. 34-35). The Village allegedly agreed to direct the release of the remaining contract funds upon Miller-Yount's completion of a few outstanding items. Once Miller-Yount completed those items, the Village was supposed to direct a release of the remaining contract funds to Freeman Cargo's attorney, David Comstock. Comstock was to hold the funds in escrow until Miller-Yount and Freeman Cargo worked out exactly how much Miller-Yount was owed and then pay Miller-Yount that amount.
Miller-Yount proceeded to take care of the outstanding items. In June 1994, the Village submitted a disbursement request to the OPWC for $62,340.62, designating Freeman Cargo as the payee. (Plaintiff's Exhibit I). The OPWC approved the request on July 7, 1994, and sent $56,106.56 (i.e., 90 percent of $62,340.62) by an electronic fund transfer directly to Freeman Cargo's bank account. When the funds reached Freeman Cargo's bank account, they were immediately seized by the Internal Revenue Service.[5] As a result, Miller-Yount never received payment.
In response, Miller-Yount filed a complaint on September 23, 1994, naming as party defendants Freeman Cargo, the Village, and the OPWC. Miller-Yount sought to recover $91,822.00 on the lien it had previously filed plus interest.[6] Miller-Yount also sought $100,000.00 in punitive damages.
On December 20, 1994, the Village filed an answer and a cross-claim against Freeman Cargo alleging breach of contract and seeking indemnification. Freeman Cargo, through its attorney, David Comstock, filed an answer on December 23, 1994, setting forth various denials and defenses in response to the claims and allegations made in Miller-Yount's complaint. Freeman Cargo never responded to the Village's cross-claim and subsequently failed to respond to discovery requests. On July 10, 1995, the trial court granted Comstock's motion to withdraw as counsel for Freeman Cargo. Comstock had filed the motion based on Freeman Cargo's failure to cooperate in the defense of its claim.
On January 14, 1998, the Village filed a motion for leave to add State Auto as a necessary party pursuant to Civ.R. 20. On January 21, 1998, the court granted the Village's motion and added State Auto as a party defendant to the action. On May 8, 1998, State Auto filed a motion to dismiss or, in the alternative, motion for summary judgment. The magistrate granted State Auto's summary judgment motion on June 26, 1998, and dismissed it from the case.
The case proceeded to a trial before the magistrate on August 27, 1998. The magistrate returned his decision on September 27, 1998, finding in favor of Miller-Yount and against Freeman Cargo, the OWPC, and the Village. The magistrate made the following orders:
 "The defendant Village of Craig Beach is ordered to pay to the plaintiff Miller-Yount Paving, Inc. the sum of $67,027.62 with interest thereon computed as follows: 8% per annum on the sum of $62,340.00 compounded daily since December 3, 1993, and 8% per annum on the sum of $4,687.62 compounded daily since June 23, 1994.
 "The defendant Ohio Public Works Commission is ordered to pay to the plaintiff Miller-Yount Paving, Inc. the sum of $56,106.00 with interest thereon at 8% per annum compounded daily since June 23, 1994.
 "Any payment or payments made, pursuant to the foregoing orders, by either of those defendants shall be credited to and reduce to the extent of such payment or payments the obligation of the other defendant under these orders.
 "The plaintiff Miller-Yount Paving, Inc. is granted judgment against the defendant Freeman Cargo Carrier, Inc. in the sum of $86,828.46 with interest thereon at 10% per annum since December 3, 1993. Any payment or payments made to the plaintiff by the defendant Freeman Cargo Carrier, Inc. on the judgment shall be credited to and reduce to the extent of such payment or payments the obligations of the defendants Village of Craig Beach and Ohio Public Works Commission.
 "The defendant Village of Craig Beach is granted judgment on its cross-claim against the defendant Freeman Cargo Carrier, Inc. in the amount of any payments it makes to the plaintiff Miller-Yount Paving, Inc. in compliance with the foregoing order upon it."
The OPWC and the Village filed objections to the magistrate's decision. On October 30, 1998, the trial court judge overruled the objections and adopted the magistrate's decision as its own. The Village and the OPWC filed this appeal. Freeman Cargo did not appear at trial and has not filed an appeal.
 I. STANDARD OF REVIEW
In our examination of the magistrate's decision as adopted by the trial court below, we are guided by the principle that judgments supported by competent, credible evidence must not be reversed, as being against the manifest weight of the evidence.Gerijo, Inc. v. Fairfield (1994), 70 Ohio St.3d 223, 226; C.E.Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. We must indulge every reasonable presumption in favor of the lower court's judgment and finding of facts. Gerijo,supra; Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80. "In the event the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment." Seasons Coal Co., supra. In reviewing questions of law, an appellate court may properly substitute its judgment for that of the trial court since an important function of the appellate court is to resolve disputed propositions of law. Arnold v. Am. Natl. Red Cross (1994), 93 Ohio App.3d 564,575.
 II. OPWC'S ASSIGNMENTS OF ERROR
The OPWC's appellate brief sets forth two assignments of error. The second assignment of error presents four separate issues for review. Due to the interrelated nature of the OPWC's first assignment of error and the first issue presented for review under the OPWC's second assignment of error, this opinion will address them together.
 A. JURISDICTION
The OPWC alleges in its first assignment of error that:
 "The trial court erred in finding that it had jurisdiction to determine the liability of the Defendant the Ohio Public Works Commission.
The OPWC alleges in its second assignment of error that:
 "The trial court erred in finding liability on the part of the Defendant Ohio Public Works Commission as it incorrectly applies the law in R.C. 1311.26 et seq."
The first issue presented for review by the OPWC under its second assignment of error states:
 "The Court Has Improperly Applied Its Jurisdiction Through R.C. 1311.32"
In 1975, the General Assembly enacted the Court of Claims Act, embodied in R.C. Chapter 2743. The Act waived the state's immunity from liability and consented to be sued, and have its liability determined, in the court of claims. R.C. 2743.02(A)(1). To the extent that the state had previously consented to be sued, R.C. Chapter 2743 has no applicability. Id. The court of claims has exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity contained in R.C.2743.02. R.C. 2743.03(A)(1). "Thus, to the extent that any actions were permitted against state * * * agencies in a court of common pleas prior to the enactment of R.C. Chapter 2743, those actions may be maintained against the state in a court of common pleas subsequent to the enactment of R.C. Chapter 2743. R.C.2743.02(A)(1)." (Emphasis sic.) Racing Guild of Ohio, Local 304v. State Racing Comm. (1986), 28 Ohio St.3d 317, 319-320.
Prior to the enactment of R.C. Chapter 2743, the mechanic's lien statutes relating to public improvement projects (R.C.1311.25 et seq.) applied to the state. Poenisch v.Kingsley-Dunbar, Inc. (1990), 64 Ohio App.3d 699, 703; State, ex rel.Nixon, v. Merrell (1933), 126 Ohio St. 239. The reasoning was that the state was merely a "stakeholder" in such cases because an "action to enforce a mechanic's lien is an action against the fund held by the defendant state, not an action against the defendant state itself." Poenisch, 64 Ohio App.3d at 703.
In Poenisch, the court went on to hold that since "an action for the enforcement of mechanic's liens against a public fund held by the state as a mere stakeholder existed prior to the enactment of R.C. Chapter 2743, R.C. 2743.02(A)(1) provides that the court of common pleas retains jurisdiction over these types of actions." Id. at 703. Both the magistrate and Miller-Yount cite Poenisch in support of the trial court's jurisdiction over this matter.
However, as the OPWC correctly notes, reliance on Poenisch is misplaced. The OPWC is a "stakeholder" in this matter only to a very limited extent and R.C. 1311.25 et seq. has little or no application to the OPWC.
A public improvement project usually involves a contract between the public authority and a principal contractor. Oftentimes, certain work or materials called for under the contract are performed or provided by subcontractors, materialmen, or general laborers. They perform labor or work or furnish material for the project under a contract, not with the public authority, but with the principal contractor.
Thus, subcontractors, materialmen, or laborers lack privity of contract with the public authority itself. In order to assure payment, R.C. 1311.25 et seq. "afford[s] a species of garnishment to protect the subcontractor against the risk of loss of the payments properly due him should they reach his principal contractor in whose hands they may be subject to the latter's creditors or to his own caprice." Lee Turzillo Contracting Co. v.Cin. Met. Housing Authority (1967), 10 Ohio St.2d 5, 9.
Pursuant to R.C. 1311.26,[7] a subcontractor, materialman, or laborer, who has performed labor or work or has furnished material for any public improvement under a contract with the principal contractor, may serve the public authority an affidavit stating the amount due and unpaid for the labor and work performed and material furnished, and thereby obtain a lien on the funds. The word "may" as used in the statute is mandatory.Crock Constr. Co. v. Stanley Miller Constr. Co. (1993), 66 Ohio St.3d 588,593, fn. 2.
After receiving notice of the claimant's lien, the public authority must detain from the principal contractor all subsequent payments as do not in the aggregate exceed the claims of the lien claimant. R.C. 1311.28. The public authority must place the detained funds in an escrow account as provided for under R.C. 153.63. Id. The funds may be released as instructed by the court or by agreement of the principal contractor and the subcontractor, materialman, or laborer who filed the lien. Id.
R.C. 1311.29 sets forth the priorities among several claimants and requires a claimant filing pursuant to R.C. 1311.26 to provide notification to other potential claimants. R.C. 1311.31
requires the public authority, or allows the lien claimant in the name of the public authority, to furnish the principal contractor with the R.C. 1311.26 filing together with a notice that the principal contractor must give notice within twenty days of its receipt of his intention to dispute the claim. If the principal contractor fails to give notice of his intention to dispute the claim within the time allowed, then it is deemed to have assented to the correctness of the claim. R.C. 1311.31. Where the claims have been assented to, the amount detained from the principal contractor is to be applied pro rata among the lien claimants as prescribed in R.C. 1311.29.
The duty to pay lien claimants the amount due in order of their preference may be enforced by an action in the court of common pleas or the lien claimant, when the amounts are due, may recover through the public authority in the court of common pleas the whole or pro rata amount of his claim or estimate, not exceeding in any case the balance due to the principal contractor. R.C.1311.32.[8]
When Miller-Yount filed suit on September 3, 1994, there was only $4,687.62 in contract funds due to Freeman Cargo. (Defendant-OPWC's Exhibit 4; Tr. 188, 190). As R.C. 1311.32
indicates, a public works lien operates on, and only on, the fund due or to become due to the principal contractor. See also 68 Ohio Jurisprudence 3d (1986) 313, Mechanic's Liens, Section 232. "If there is no such fund due or to become due from the public body to the principal contractor * * * there is nothing to which the lien may attach." 68 Ohio Jurisprudence 3d 313 (1986), Mechanic's Liens, Section 232. Therefore, the most Miller-Yount could recover by way of its lien was $4,687.62. To the extent that it could recover that amount, it could recover only 90 percent ($4,218.66) of that amount from the OPWC. However, as will be discussed infra, Miller-Yount could not recover that amount from the OPWC by way of a lien action filed pursuant to R.C. 1311.25 et seq. because the OPWC is not a "public authority."
Nevertheless, Miller-Yount also sought recovery from the OPWC based upon a cause of action independent of the lien. Miller-Yount's complaint alleges that the OPWC released the contract funds directly to Freeman Cargo, "willfully, wrongfully, intentionally, and negligently" disregarding the lien. In addition, the complaint sought an award of monetary damages, both compensatory and punitive.
Actions for money damages against the state are clearly within the exclusive jurisdiction of the Court of Claims. Friedman v.Johnson (1985), 18 Ohio St.3d 85; Racing Guild of Ohio, Local 304v. State Racing Comm. (1986), 28 Ohio St.3d 317; Boggs v. State
(1983), 8 Ohio St.3d 15. "[A]ttaching a prayer for monetary relief places the action properly before the Court of Claims."Ballengee v. Ohio Dept. of Rehab. Corr. (1996), 79 Ohio Misc.2d 69,74. "This applies to actions in contract as well as tort."Ohio Edison Co. v. Ohio Dept. of Transp. (1993), 86 Ohio App.3d 189,192. Therefore, Miller-Yount's claim against the OPWC could only be brought in the court of claims.
 B. OPWC'S STATUS AS A PUBLIC AUTHORITY
The second issue presented for review by the OPWC under its second assignment of error states:
 "OPWC is not the Public Authority or Owner As Applied in the Statutory Scheme 1311.25 et seq."
Another reason the trial court could not maintain jurisdiction over Miller-Yount's claim against the OPWC pursuant to the statutory scheme set forth in R.C. 1311.25 et seq. is that, for purposes of this case, the OPWC is not a "public authority." In the statutory framework set forth in R.C. 1311.25 et seq., reference is continually made to the "public authority." For example, upon notice of the claimant's lien, it is the responsibility of the "public authority" to detain the project funds from the principal contractor and place them in escrow.
R.C. 1311.25(B) defines "public authority" as follows:
 "`Public authority' includes the state, and a county, township, municipal corporation, school district, or other political subdivision of the state, and any public agency, authority, board, commission, instrumentality, or special district of or in the state or a county, township, municipal corporation, school district, or other political subdivision of the state, and any officer or agent thereof.".
On its face, the definition of a "public authority" set forth in R.C. 1311.25(B) would seem to include an agency such as the OPWC. However, an interpretation of the statutory scheme and the relevant case law as set forth by the OPWC seems to support its proposition that it is not a "public authority." The OPWC argues that the Village, as the owner of the Project, is the public authority for purposes of the statute.
Various provisions of R.C. 1311.25 et seq. refer to the "public authority" as the entity that has entered into a contract with the principal contractor for completion of the project. There is no dispute in this case that the parties that contracted for completion of the Project were Freeman-Cargo and the Village. Therefore, the Village is the only "public authority" for purposes of R.C. 1311.25 et seq.
Case law is in accord. Cases applying and interpreting R.C.1311.25 et seq. equate the "public authority" to the "owner" of the public work. See Poenisch v. Kingsley-Dunbar, Inc. (1990),64 Ohio App.3d 699; Lee Turzillo Contracting Co. v. Cin. Met.Housing Authority (1967), 10 Ohio St.2d 5.
Consequently, the trial court did not have jurisdiction to hear Miller-Yount's claim against the OPWC. "A judgment rendered by a court lacking subject matter jurisdiction is void ab initio."Patton v. Diemer (1988), 35 Ohio St.3d 68, paragraph three of the syllabus.
 C. R.C. 1311.28 COMPLIANCE
The third issue presented for review by the OPWC under its second assignment of error states:
 "R.C. 1311.28 Provides that the Funds May Be Released Upon Agreement of the Contractor and Subcontractor."
In addition to arguing the inapplicability of R.C. 1311.25 etseq., the OPWC argues that nevertheless there was compliance with the statutory scheme, save one exception. The OPWC concedes that the only exception to compliance with the statutory scheme occurred when the funds were not placed into escrow.
Essentially, the OPWC argues that there was substantial compliance with the statutory scheme, citing to R.C. 1311.28. That section provides in relevant part:
 "The public authority shall place any detained funds in an escrow account as provided for under section 153.63 of the Revised Code, to be released at the time, in the amounts, and to the persons ordered by a court of competent jurisdiction or by agreement of the principal contractor and the subcontractor, materialman, or laborer who filed the affidavit provided for in section 1311.26
of the Revised Code or upon a failure to commence suit as provided in section 1311.311." (Emphasis added.)
In either April or May of 1994 various parties met to discuss resolution of Miller-Yount's lien. The following were present at that meeting: Herbert Cottrell, President of Miller-Yount; the Village, represented by Attorney Glenn J. Schwartz; George Freeman, Jr., President/Owner of Freeman Cargo, represented by Attorney David C. Comstock, Jr.; and the Village represented by Attorney Marc Dann. (Tr. 34-35). The OPWC was not represented at the meeting. (Tr. 47).
Comstock testified that the parties reached a preliminary agreement. (Tr. 35, 36). The Village agreed to release the state funds to Comstock after Miller-Yount completed some remaining items of work on the Project. (Tr. 34, 44, 48). Comstock was to hold the funds in escrow. (Tr. 35, 51). Once Miller-Yount and Freeman Cargo resolved their dispute as to exactly how much was owed, Comstock was to release that amount to Miller-Yount. (Tr. 35).
Subsequent to the meeting and in a letter dated June 23, 1994, Marc Dann, solicitor of the Village, told the Mayor to go ahead and direct the release of the state funds to Freeman Cargo. (Exhibit F). After receiving this letter and the necessary paperwork from the Village, the OPWC released the funds to Freeman Cargo in mid-July 1994. (Tr. 118).
The foregoing supports the conclusion that the parties attempted to comply with the settlement option provision contained in R.C. 1311.28. Therefore, it would be improper and entirely unfair to make the OPWC, who was not a party to the settlement negotiations, repay funds that it lawfully released.
The magistrate seemed to ignore this provision of the statutory scheme and instead implicitly concluded that the parties could not agree to a release of the state funds and that the OPWC would not be allowed to release the funds pursuant to such an agreement. Clearly, this interpretation of the statutory scheme is inconsistent with the plain language of R.C. 1311.28.
 D. CONTROL OF PROJECT FUNDS
The fourth issue presented for review by the OPWC under its second assignment of error states:
 "The Magistrate Incorrectly States That the OPWC and the Village Had Joint Control of the Funds."
The OPWC also takes issue with the magistrate's finding that the Village and the OPWC had joint control over the project funds. The testimony of Melvin J. Gravely, a program representative for the OPWC, was illustrative of the process by which state funds are disbursed to local governments for public improvement projects. He testified that project funds are not in the OPWC's possession and that it is not in a position to detain the funds. (Tr. 83).
Project funds reside in the General Warrant Fund of the State of Ohio. After a project is initiated, the OPWC acts in a somewhat limited capacity. If the owner of a public improvement project (e.g., a political subdivision) wants to pay someone who has performed work on the project, it must submit to the OPWC a form entitled Appendix E. (Tr. 74). Through Appendix E, the political subdivision requests a release of matching state funds to a particular subcontractor or other person who has performed work on the project. The OPWC reviews the paperwork and then forwards it to the treasurer so that the funds may then be released. (Tr. 83).
Consequently, the OPWC has limited control over the project funds. The only way the Project funds could have been released to an escrow account was at the direction of the Village. (Tr. 84). Thus, the only party, if any party at all, that should be held responsible for the release of project funds to Freeman Cargo is the Village.
Accordingly, the OPWC's first and second assignments of error have merit.
 II. VILLAGE OF CRAIG BEACH'S ASSIGNMENTS OF ERROR
The Village's appellate brief sets forth three assignments of error. The Village's first assignment of error presents four separate issues for review. The Village's second assignment of error presents two separate issues for review. The Village's third assignment of error presents only one issue for review.
The Village's first assignment of error states:
 "Errors in the application of the Statutory Directives of ORC Sections 1311.25 through 1311.36, inclusive."
 A. MILLER-YOUNT'S STATUS AS A SUBCONTRACTOR
The first issue presented for review by the Village under its first assignment of error states:
 "The Trial Court erred in making no compliance finding that the Plaintiff was, in fact, a `subcontractor,' for purposes of ORC Sections 1311.25 through 1311.36, inclusive and instead silently presumed the same "
The Village argues that Miller-Yount was not a "subcontractor" for purposes of R.C. 1311.25 et seq. and, therefore, could not be afforded its protections. Initially, Miller-Yount was only supposed to provide Freeman Cargo with the materials to get the Project started. (Tr. 55, 71).
After Freeman Cargo was awarded the contract for completion of the Project, it was required to provide the OPWC with information concerning the subcontractors and/or suppliers that it would be utilizing for completion of the Project. (Defendant-Village Exhibit 1). Freeman Cargo listed Miller-Yount as a subcontractor and indicated that it would be contributing services and/or materials at a cost of $33,803.00. (Defendant-Village Exhibit 1).
At trial, Herbert Cottrell, President of Miller-Yount, indicated that Miller-Yount had received payment for these materials. (Tr. 63-64). The Village argues that Miller-Yount was a subcontractor only to the extent that it supplied these materials and that, once it was paid for those materials, could no longer seek the protections of R.C. 1311.25 et seq. The Village argues that any services and/or materials provided by Miller-Yount beyond the $33,803.00 were not provided under or pursuant to a contract with Freeman Cargo. The Village argues that these additional services and/or materials were provided by Miller-Yount pursuant to the indemnity agreement between it and Trumco, issuer of the bond for the Project.
Miller-Yount argues that it was a subcontractor for purposes of R.C. 1311.25 et seq. Miller-Yount states that there is no dispute that it provided materials and services for the Project and argues that the Village welcomed its services in completing the project. Miller-Yount argues that all parties were in agreement that it was to complete the performance due under Freeman Cargo's contract with the Village.
Miller-Yount also argues that the Village has failed to demonstrate how providing a surety bond precludes it from being considered a subcontractor. It asserts that the Village is now estopped from denying its status as a subcontractor.
R.C. 1311.25(E) defines a subcontractor as "any person who undertakes to construct, alter, erect, improve, repair, demolish, remove, dig, or drill any part of any public improvement under acontract with any person other than the public authority."
(Emphasis added.) R.C. 1311.26, the section setting forth the requirements for filing a public works lien, also contemplates the existence of a contract. See fn. 6, supra. It refers to "[a]ny subcontractor * * * who * * * has performed * * * work * * * for any public improvement * * * under a contract between the subcontractor * * * and a principal contractor." R.C. 1311.26.
There really is no dispute that Miller-Yount undertook to "construct, alter, erect, improve, repair, demolish, remove, dig, or drill any part of" the Project. The issue is whether Miller-Yount provided services and/or materials for the Project under a contract with Freeman Cargo.
Cottrell's testimony on this issue went as follows:
 "Q What does Miller-Yount Paving, Inc., do as a corporation, as a business?
"A We do construction work, paving, excavation, so forth.
 "Q And did there come a time when you did some work involving the defendant, Freeman Construction?
"A Yes.
"Q And how did that come about?
 "A Mr. Freeman came in and wanted to go in a joint venture project.
"Q And what was the project?
"A A road and sewer improvement for Craig Beach.
"Q Who was the contractor, the principal contractor on that?
"A Mr. Freeman.
"Q And what was the capacity of Miller-Yount to be?
 "A We were subcontractors, supply materials and so forth for him.
 "Q And did you enter into that arrangement and perform services under the contract?
"A Yes." (Tr. 53-54)
Cottrell's testimony was sufficient to establish that there existed a contract between Miller-Yount and Freeman Cargo, be it express or implied-in-fact. Miller-Yount's securing of the bond for the Project in Freeman Cargo's name is further evidence that there was an agreement between them concerning completion of the Project. Therefore, Miller-Yount was a subcontractor for purposes of R.C. 1311.25 et seq.
 B. R.C. 1311.28 COMPLIANCE
The second issue presented for review by the Village under its first assignment of error states:
 "The Trial Court erred in making no finding, with regard to the uncontroverted evidence of a meeting held between the Representatives of the Principal Contractor, the Plaintiff and the Village, as to whether or not such meeting and agreement complied with the directives of ORC Section 1311.28."
This is the same issue as the third issue presented for review by the OPWC under its second assignment of error. We incorporate herein by reference our discussion and resolution of that issue.
 C. R.C. 1311.29 COMPLIANCE
The third issue presented for review by the Village under its first assignment of error states:
 "The Trial Court erred in making its finding that the Plaintiff's failure to file its purported lien with the Mahoning County Recorder's Office, pursuant to ORC Section 1311.29 was not affected by other competing liens."
The Village argues that Miller-Yount caused its own loss by failing to file its lien with the county recorder's office. On this issue, the magistrate commented as follows:
 "The filing of a lien on a public authority is perfected when served on the public authority and the contractor. Its filing with the county recorder is for the sole purpose of notifying other subcontractors, etc., of the claimant's lien. R.C. 1311.29. There were no other subcontractors, etc., who were affected by Miller-Yount's lien." Magistrate's Decision, September 1, 1998, p. 6
The Village argues that the magistrate's finding that there were no "other subcontractors, etc." was arbitrary given that it had earlier recognized that the Internal Revenue Service had a prior lien on Freeman Cargo's bank account. The Village argues that the effect of the magistrate's decision was to give Miller-Yount an undeserved priority position. The Village also argues that Miller-Yount was aware of the protections afforded by filing a lien with the county recorder's office because it had done so on prior occasions involving other projects.
Miller-Yount argues that the Village is confused about where the parties' respective liens attach. Miller-Yount distinguishes its lien from that of the IRS. Miller-Yount maintains that the IRS lien was on Freeman Cargo's bank account whereas its lien was on the Project funds. Miller-Yount asserts that there was no need to establish priority among and between it and the IRS since their interests were in two completely separate assets. Miller-Yount concludes that since there were no other interests in the Project funds the magistrate correctly held that R.C. 1311.29
does not apply.
R.C. 1311.29 provides in relevant part:
 "A subcontractor, materialman, laborer, or person who serves the affidavit pursuant to section 1311.26 of the Revised Code, in order to notify other subcontractors, materialmen, and laborers, within thirty days thereafter, shall file for record a copy of the affidavit with the county recorder of the county where the public improvement is situated or with the county recorder of each of the counties where the public improvement is situated if the public improvement is situated in more than one county. The filing for record of the affidavit with the county recorders gives such subcontractor, materialman, laborer, or person filing the affidavit as provided in section 1311.26 of the Revised Code, a preference, as to payments subsequently due from the public authority, over such of his other subcontractors, materialmen, and laborers who have failed, prior to the date any such payment is due, to file the affidavit provided for in section 1311.26 of the Revised Code, and to file for record the copy thereof with the county recorders as provided in this section. On detained funds, such claimants have no priority among themselves, but payment thereon shall be made to them in amounts prorated according to the amount of the then-existing valid claim of each. The failure of any claimant to file for record a copy of the affidavit with the county recorders does not affect the validity of his amount claimed with respect to persons other than such of his other subcontractors, materialmen, and laborers who have filed for record copies of their affidavits with the county recorders, and, against detained funds, such claimants who have failed to make such filing for record with the county recorders have no priority among themselves, but, after all claims having preference over theirs have been paid, payment shall be made to them in amounts prorated according to the amount of the then-existing valid claim of each." (Emphasis added.)
R.C. 1311.29 makes clear that a subcontractor who does file his lien with the county recorders officer gains preference only over those other subcontractors, materialmen, or laborers who did not file. In this case, there is no dispute that no subcontractors, materialmen, or laborers, other than Miller-Yount, had filed a lien on the Project funds. Therefore, the magistrate was correct in making such a finding. Even if Miller-Yount's lien and the IRS's lien both attached to the same funds, Miller-Yount's filing of its lien with the county recorders office or its failure to do so would not affect its priority to the funds in relation to the IRS.
 D. APPLICABILITY OF R.C. 1311.32
The fourth issue presented for review by the Village under its first assignment of error states:
 "The Trial Court erred in enlarging the statutory limits of recovery found in ORC Section 1311.32."
This is the same issue as the first issue presented for review by the OPWC under its second assignment of error. We incorporate herein by reference our discussion and resolution of that issue. As we indicated earlier, when Miller-Yount filed suit on September 3, 1994, there were only $4,687.62 in contract funds due to Freeman Cargo. (Defendant-OPWC Exhibit 4; Tr. 188, 190). R.C. 1311.32 provides that a public works lien operates on, and only on, the fund due or to become due to the principal contractor. See also 68 Ohio Jurisprudence 3d (1986) 313, Mechanic's Liens, Section 232. "If there is no such fund due or to become due from the public body to the principal contractor * * * there is nothing to which the lien may attach." 68 Ohio Jurisprudence 3d (1986) 313, Mechanic's Liens, Section 232. Thus, the most Miller-Yount could recover from the Village by way of the lien was $4,687.62. To the extent that Miller-Yount sought to recover from the Village any amount in excess of $4,687.62, the action could not be based upon the lien and R.C. 1311.32. That recovery would have to be based upon Miller-Yount's allegation that the Village "willfully, wrongfully, intentionally, and negligently" released the contract funds directly to Freeman Cargo. However, the magistrate inappropriately limited the proceedings to the issue of compliance with R.C. 1311.25 et seq.
Accordingly, the Village's first assignment of error is sustained in part and overruled in part.
 E. MBE SET ASIDE COLLUSION
The Village's second assignment of error states:
"Errors in the Conduct of the Trial."
The first issue presented for review by the Village under its second assignment of error states:
 "The Trial Court erred by disallowing defenses attempted by the Village to show that Plaintiff was in collusion with the Principal Contractor to obtain the Project Contract, so has come to this forum with unclean hands."
As a condition of the Village's awarding the contract for construction of the Project to Freeman Cargo, Freeman Cargo had to promise to make good faith efforts to award subcontracts to State Certified Minority Business Enterprises in an aggregate dollar value of no less than five percent of the prime contract amount.[9] (Defendant-Village Exhibit 5, p. BD-16, paragraph A). The Village argues that Miller-Yount was in collusion with Freeman Cargo to avoid the five percent set aside requirement.
The Village points to Cottrell's testimony characterizing the relationship between Miller-Yount and Freeman Cargo as a joint venture and that Miller-Yount supplied the bond for the Project. (Tr. 54, 62). The Village also points to Miller-Yount's increased level of involvement in the Project. Initially, Miller-Yount was only supposed to provide $33,803.00 worth of services and/or materials. (Defendant-Village Exhibit 1). Ultimately, Miller-Yount took over completion of the Project and provided a total of $156,367.46 worth of services and/or materials. (Tr. 71; Plaintiff's Exhibit E).
The Village argues that the magistrate arbitrarily dismissed all of this evidence on collusion and refused to allow it to pursue the issue as a defense to Miller-Yount's claims of negligence.
In response, Miller-Yount states that the Village's argument of "unclean hands" is nothing more than "smoke and mirrors." Miller-Yount argues that there is no evidence in the record that Freeman Cargo did not make good faith efforts.
The issue of the parties' compliance with the MBE set-aside requirements arose during the testimony of Melvin Gravely, a program representative for the OPWC. During cross-examination of Mr. Gravely by the attorney for the Village, Ms. Ishraq Hafiz, the magistrate interrupted and the following colloquy took place.
 "THE COURT: Excuse me. Where are you going with this? What's all of that have to do with this case? Can you tell me briefly without making a speech on it? Just tell me briefly where are you going with this.
 "MS. HAFIZ: Naturally I am trying to show that there was collusion between the principal contractor and the plaintiff.
"THE COURT: How would he know this?
 "MS. HAFIZ: He is laying foundation, Your Honor, to show what is required under this program.
 "THE COURT: And the alleged collusion was, what, to escape the minority set-aside program?
 "MS. HAFIZ: To be eligible without proper basic requirements, yes, so —
 "THE COURT: You know, that's all water over the damn (sic.) at this point. You know, the money has long been disbursed. You folks approved it. You accepted the work, and now you are saying that there was some problem with Freeman. I am afraid you should bring that up with Freeman, okay." (Tr. 107-108)
In his decision issued after trial, the magistrate added:
 "As to the MBE issue, Freeman had the obligation to make "good faith efforts' to award subcontracts to MBE. DVX-3, p. BD-16, par. A. There was no evidence it did not make such efforts. Moreover, Miller-Yount's assistance to Freeman in obtaining a bond and its agreement to indemnify the bonding company for losses it might suffer is not evidence of an attempt to dodge the MBE requirement, even if Freeman did attempt to dodge it, and is not evidence of the violation of Freeman's non-collusion affidavit (DVX-3, p. 10, sec. 21), for that deals with rigging bids. Miller-Yount's willingness to pledge its credit to the bonding company was a business judgment it made to become a supplier of materials to Freeman. That is not an unusual arrangement in the construction and other industries. It did not diminish the Village's protection. In fact, it served the Village well: it gave Miller-Yount added incentive to correct Freeman's work and to complete it to the Village's satisfaction." Magistrate's Decision, September 1, 1998, p. 7.
Miller-Yount sought recovery based on the lien and an allegation that the Village and the OPWC "willfully, wrongfully, intentionally, and negligently" released the contract funds directly to Freeman Cargo. Whether or not Freeman Cargo and Miller-Yount were in collusion to avoid the MBE set-aside requirements is irrelevant to a resolution of either of these claims.
Freeman Cargo and the Village were the only parties obligated to make good faith efforts to comply with the MBE set-aside program. Miller-Yount had no such obligation. Even if negligence were an issue at trial, Freeman Cargo's alleged noncompliance with the state's minority set-aside program is not a valid defense to negligence since it bears no relevance to the issue of Miller-Yount's lien.
 F. NEGLIGENCE DEFENSES
The second issue presented for review by the Village under its second assignment of error states:
 "The Trial Court erred in allowing Plaintiff's negligence allegations, yet disallowing Defendant's defenses to same."
The following colloquy reveals what the real issues were at trial.
 "THE COURT: * * * Boy, I sure wish we could get to the issues of this case.
 "MS. HAFIZ: Your Honor, the issues as I see them are issues of negligence, duty, breach, causation and damage. * * *
 "THE COURT: The issues in this case are compliance with statutory law.
"MS. HAFIZ: Right; that's true too.
 "THE COURT: I don't care if somebody was negligent or not. The issues are did you comply with the statute or didn't you. It's a [sic] simple that.
"MS. HAFIZ: Well —
 "THE COURT: Even if you didn't comply with the statute and you were not negligent, you are still liable.
"MS. HAFIZ: Say that again, Your Honor.
"THE COURT: If you did not comply with the statute —
"MS. HAFIZ: Right.
 "THE COURT: —you are liable whether your noncompliance was through negligence, indifference, recklessness, whatever.
"MS. HAFIZ: But that applies to both parties.
"THE COURT: You either comply with the statute or you didn't.
"MS. HAFIZ: Right.
"THE COURT: That's the issue here.
"MS. HAFIZ: Right.
"THE COURT: So let's go to that issue.
"MS. HAFIZ: Okay.
 "THE COURT: In so far as it's possible. They may have alleged negligence, but I am not particularly — I don't know —I don't care about the negligence, to tell you the truth.
"MS. HAFIZ: Okay. Okay. Well —
"THE COURT: They either complied with statute or they didn't.
 "MS. HAFIZ: All right. Then I am done with the questioning of Mr. Gravely." (Tr. 110-112).
As indicated earlier, when Miller-Yount filed suit on September 3, 1994, there was only $4,687.62 in contract funds due to Freeman Cargo. (Defendant-OPWC Exhibit 4; Tr. 188, 190) R.C.1311.32 provides that a public works lien operates on, and only on, the fund due or to become due to the principal contractor. See also 68 Ohio Jurisprudence 3d (1986), Mechanic's Liens, Section 232. "If there is no such fund due or to become due from the public body to the principal contractor * * * there is nothing to which the lien may attach." 68 Ohio Jurisprudence 3d (1986), Mechanic's Liens, Section 232. Thus, the most Miller-Yount could recover from the Village by way of the lien was $4,687.62. To the extent that Miller-Yount sought to recover from the Village any amount in excess of $4,687.62, the action could not be based upon the lien and R.C. 1311.32. That recovery would have to be based upon Miller-Yount's allegation that the Village "willfully, wrongfully, intentionally, and negligently" released the contract funds directly to Freeman Cargo.
Consequently, the magistrate erred in limiting the proceedings to the issue of compliance with R.C. 1311.25 et seq. However, the defense that the Village wanted to pursue was that there was collusion between Freeman Cargo and Miller-Yount to avoid the MBE set-aside requirements. As indicated earlier, this purported defense was irrelevant to Miller-Yount's claims. Therefore, the magistrate did not err to the extent that it disallowed the Village to pursue this particular defense.
Accordingly, the Village's second assignment of error is without merit.
 G. LIABILITY OF STATE AUTOMOBILE MUTUAL INSURANCE COMPANY
The Village's third assignment of error states:
 "The Trial Court errs by not clarifying, as requested, the liability of the Project bond issuer, State Automobile Insurance Company, based on its ultimate finding of fault by Principal Contractor, Freeman Cargo Carrier and award to Co-Defendants the Village and OPWC of their indemnification claim."
On January 14, 1998, the Village filed a motion for leave to add State Auto as a necessary party pursuant to Civ.R. 20. On January 21, 1998, the court granted the Village's motion and added State Auto as a party defendant to the action. On May 8, 1998, State Auto filed a motion to dismiss or, in the alternative, motion for summary judgment.
On June 26, 1998, the magistrate granted State Auto's summary judgment motion. The court acknowledged that State Auto was Freeman Cargo's surety on a bond it issued to the Village as obligee, assuring Freeman Cargo's performance under the contract and payment of subcontractors, materialmen, and laborers. However, the magistrate found that there was no evidence that the Village or any other party notified State Auto of Miller-Yount's lien or of the Village's and OPWC's decision to pay Freeman Cargo all the money due on the contract despite receipt of the lien prior to making payment to Freeman Cargo. The magistrate elaborated as follows:
 "In this case, the Village seeks to hold State Auto liable for the Village's own violation of R.C. 1311.28 in paying Freeman. The statute proscribed payment without a court order or without an agreement between Freeman and Miller-Yount. The Village either intentionally or negligently violated the statute. Neither R.C. 153.S6 nor the State Auto bond pursuant thereto provides protection to the Village for its own violation of R.C. 1311.28." Magistrate's Decision, June 26, 1998, p. 4
Contrary to the Village's assertion, the magistrate's order granting State Auto summary judgment does not need clarification. The bond provided protection to the Village only for Freeman Cargo's failure to perform under the contract. The Village has stated that the contract has been fully performed. Miller-Yount's claim against the Village is based on the Village's disregard for its lien. The bond is irrelevant to this issue.
Accordingly, the Village's third assignment of error is without merit.
The judgment of the trial court is hereby reversed. Since the trial court lacked subject matter jurisdiction to hear Miller-Yount's claims against the OPWC, its judgment in that regard is void ab initio. As to the Village, the case is remanded for a new trial on two issues: (1) Miller-Yount's statutory lien claim (R.C. 1311.32) against the Village to the extent that the $4,687.62 in contract funds remain due and (2) Miller-Yount's common law claim that the Village "willfully, wrongfully, intentionally, and negligently" released the contract funds directly to Freeman Cargo.
COX, J., VUKOVICH, J., concurs.
 _________________________ GENE DONOFRIO, JUDGE.
[1] The purpose of the Project was to construct an enclosed storm water drainage system in the area of Hillcrest and Glendale Drives and to place an asphalt concrete overlay on the existing pavement surface.
[2] R.C. 122.71(E)(1) defines a minority business enterprise as an individual, partnership, corporation, or joint venture of any kind that is owned and controlled by United States citizens, residents of Ohio, who are members of one of the following economically disadvantaged groups: Blacks, American Indians, Hispanics, and Orientals."
[3] Fok received a total of $44,414.00 for its services. (Defendant-OPWC Exhibit 4).
[4] Subsequently, a "change order" of $6,460.00 brought the total contract price to $165,841.00. (Plaintiff's Exhibit C).
[5] The record is devoid of any evidence substantiating the assumption made by each of the parties to this appeal that the IRS seized the funds. However, the ultimate destination of those funds is inconsequential given that it is undisputed that Miller-Yount did not receive those funds and, to date, remains unpaid. (Tr. 60).
[6] The $91,822.00 stated by Miller-Yount in its complaint is consistent with the lien it filed in November 1994. However, Cottrell testified that subsequent to filing the lien he made a detailed review of the company's books and records and arrived at the correct amount due. (Tr. 57). The correct amount due is reflected in a letter from Miller-Yount to its attorney dated April 14, 1994. (Plaintiff's Exhibit E). The letter contains a breakdown of all the work done on the Project by Miller-Yount, totaling $156,367.46. The letter also acknowledges payments received totaling $69,539.00, leaving a total amount due of $86,828.46. Why Miller-Yount's complaint does not state the correct amount due of $86,828.46 remains unexplained.
[7] R.C. 1311.26 provides:
 "Any subcontractor, materialman, or laborer who is performing or has performed labor or work or is furnishing or has furnished material for any public improvement provided for in a contract between the public authority and a principal contractor, and under a contract between the subcontractor, materialman, or laborer and a principal contractor or subcontractor, at any time, not to exceed one hundred twenty days from the performance of the last labor or work or furnishing of the last material, may serve the public authority an affidavit stating the amount due and unpaid for the labor and work performed and material furnished, when the last of the labor or work was performed and when the last of the material was furnished with all credits and setoffs thereon, and the post-office address of the claimant. If a claimant serves an affidavit under this section, he shall serve the affidavit to the representative of the public authority named in the notice of commencement.
 "One or more laborers may authorize an agent to prepare, execute, file, and serve the affidavit required by this section. The affidavit may set forth the claims of one or more laborers, provided that the affidavit separately itemizes the claim of each laborer and may set forth claims for wages that are contractually due but are unpaid."
[8] R.C. 1311.32, titled "REMEDIES; RECOVERY AGAINST PUBLIC AUTHORITY; PROPER FORUM," provides:
 "The duty to pay to claimants the amounts and in the order of preference, as provided in sections 1311.29 and 1311.31 of the Revised Code, may be enforced by an action in the court of common pleas or the subcontractor, materialman, or laborer may, when the amounts are due, recover through the public authority in the court of common pleas the whole or a pro rata amount of his claim or estimate, not exceeding in any case the balance due to the principal contractor. Either of these actions shall be brought in the county in which the public property involved is situated, except that actions against state officers shall be brought only in Franklin county. The court shall resolve all disputes concerning whether the affidavit filed pursuant to section 1311.26 of the Revised Code has been perfected and concerning priorities, that may arise from enforcement of the affidavit or the bond that secures the affidavit, pursuant to section 1311.311 of the Revised Code."
[9] This condition was necessary in order to obtain the OPWC's approval of OSGCIP funds for the Project.